FREDERICK KRONSBEIN, Plaintiff, *v*. THE CITY OF ROCHESTER and ADOLPH J. RODENBECK, as Mayor of Said City, Defendants.

*Municipal contract for street paving — clause therein that the contractor can enforce payment only to the extent that money is collected — it is not improvident or illegal — it does not pledge the city's credit — it does not create an indebtedness under the debt limitation of. the Constitution — special franchises are part of the assessable real estate of the city — when cash resources are to be applied in reduction of the debt.*

A clause in a contract for the paving of a city street, the expense of which is to be borne by the property owners, providing, "And it is mutually understood and agreed that the party of the second part shall not be required or liable to make the aforesaid payments, or any part thereof, or to pay anything whatever on account of said work, or by virtue of this agreement, any sooner or faster than there shall be money or funds in the treasury of said city properly applicable to that purpose, and which shall have been collected or paid into said treasury on account of said work or improvement," is not improvident or illegal, nor does it violate that part of section 10 of article 8 of the Constitution of the State of New York which prohibits a city from pledging its credit "in aid of any individual, association or corporation."

The sums to be paid by a city, pursuant to contracts for local improvements containing such a clause, do not constitute a part of the city's indebtedness within the meaning of that part of section 10 of article 8 of the Constitution of the State of New York which prohibits a city from becoming indebted in excess of ten per cent of its real estate valuation appearing by its assessment roll.

The special franchises appearing upon the assessment roll of the city pursuant to chapter 712 of the Laws of 1899, are real property and the value thereof is to be considered as part of the assessable real estate of the city in ascertaining the amount of the property upon which the debt limit is to be computed.

Cash resources of the city, which can only be applied upon specific outstanding obligations of the city, may be applied in reduction of such obligations when determining whether the debt limit of the city has been exceeded, but cash resources of the city which may lawfully be applied in payment of any obligation of the city, whether present or future, cannot be taken into consideration in determining such debt limit.

SUBMISSION of a controversy upon an agreed statement of facts, pursuant to section 1279 of the Code of Civil Procedure.

*Egerton R. Williams, Jr.*, for the plaintiff.

*William A. Sutherland*, for the defendants.

SPRING, J. :

There are several questions presented to us for solution in this submitted record. The city of Rochester contains more than 100,000 population, and is consequently one of the cities of the second class (State Const. art. 12, § 2), and the plaintiff is a tax-payer to the extent of more than $1,000 upon property in said city and the defendant Rodenbeck is the mayor thereof.

In May, 1902, the common council of said city passed a final ordinance authorizing the construction of a pavement on Fien street in said city, and the board of contract and supply, pursuant to said ordinance, advertised for bids for the construction of said pavement to be made either of brick, asphalt or trap rock. The lowest bid was for trap rock pavement and the next lower was for asphalt by Whitmore, Rauber & Vicinus, and for the sum of $6,366.

The contract was finally awarded to said bidders of asphalt pavement, and the agreement contained the following clause : " And it is mutually understood and agreed that the party of the second part shall not be required or liable to make the aforesaid payments, or any part thereof, or to pay anything whatever on account of said work, or by virtue of this agreement, any sooner or faster than there shall be money or funds in the treasury of said city properly applicable to that purpose, and which shall have been collected or paid into said treasury on account of said work or improvement."

All the other contracts outstanding for city improvements included a like clause.

The central question involved in this case is whether the city of

Rochester, in the award of this bid and in the execution of the contract, exceeded the ten per centum limitation of indebtedness prescribed by article 8, section 10, of the State Constitution. ·

There are one or two incidental questions and in a measure connected with the chief subject of the controversy to which we will first give our attention.

The first and second points in the submitted cases bring up for decision the legality of the agreement as affected by the clause quoted. That is, may the board of contract and supply embody in an agreement with a successful bidder for an authorized local improvement a stipulation by which his pay is to be deferred until collections have been made from the taxpayers applicable to this particular purpose ?

While the municipality has control of the city improvements the expense thereof is to be borne by the property abutting on the particular improvement made or benefited thereby. The city makes the contract, the property benefited is chargeable with the cost. The common council may permit the one assessed for a local improvement to pay his taxes in installments. (Laws of 1880, chap. 14, § 198, as amd. by Laws of 1901, chap. 719, and also Laws of 1880, chap. 14, § 170, as amd. by Laws of 1899, chap. 392.) The burden might become unbearable if the property owner was called upon to pay his taxes for local improvements in one payment, hence the statute permitted its payment in installments. The city, therefore, has power to make these local improvements to meet the demands consequent upon its growth. Their cost, however, is not a general burden upon the city. It is not to go into the general assessment for the whole city and still it is not expected to be paid for as soon as the work is completed.

The city cannot extend its credit to individuals or to corporations, and with these varying hindrances there seems no other policy open except to oblige the contractor to wait for his compensation until in due course of law those liable to liquidate it have paid the necessary money into the treasury to meet the expenditure. We can see nothing improvident and certainly no illegal taint in the agreement to make the payment await the collection of the taxes from the persons responsible in the end for the debt.

In *People ex rel. Ready* v. *Mayor* (144 N. Y. 63) the agree-

ment for the construction of a sewer made on behalf of the city contained the provision that no payment accrued to the relator "until the cost of said work shall have been ascertained and assessed upon and collected from the taxpayers liable to local taxation upon the same." It was there held that the relator's remedy was by mandamus to compel the city to collect the tax. The clause did not vitiate the agreement, but for the benefit of the city and the taxpayer alike postponed the payment to the contractor until those actually liable could be made to pay by the ordinary mode of procedure prescribed by the statute.

In *Hunt* v. *City of Utica* (18 N. Y. 442) and *Weston* v. *City of Syracuse* (158 id. 274) a similar clause was embodied in the agreement in each instance, and in fact it is quite common whenever local improvements are made in a city, and we do not find that it has received the condemnation of the courts.

Nor do we think this clause offends against that part of section 10 of article 8 of the Constitution prohibiting the city from pledging its credit "in aid of any individual, association or corporation." The agreement in question was made to improve the city and the mode prescribed by the statute is to levy an assessment upon the owners abutting upon the contemplated improvement, but the city must make the contract and regulate and control the improvement. It is not an intermeddler or a volunteer, but is fulfilling its obligation to itself and to its citizens and property owners in making the agreement.

It would be impracticable and strip the common council of its dominion over street improvements if the agreement were to be entered into by the property owners or if the contractor must look to them for his pay without the intervention of the city authorities. Perforce the statute the city is the intermediary, the agent of the taxpayers, and, in truth, no more than that. The machinery of the city government must be set in motion to raise the tax, but that simply relates to the procedure to be adopted to get the money. We, therefore, conclude that the agreement was legal and enforcible.

The third question is whether the sum to be paid pursuant to this agreement and other outstanding contracts of like import comprises a part of a city's indebtedness within the compass of article 8, section 10, of the Constitution, which prohibits any city becoming

indebted in excess of ten per centum of its real estate valuation appearing by its assessment roll. Is this an indebtedness of the city within the meaning of that prohibition?

If this is a debt, the liabilities of the municipality are increased to the amount of it. In fact, this is not true. It is essential that the city keep its streets improved. Liability for failure to do so frequently adds to the obligations imposed upon it. The statute (Laws of 1880, chap. 14, § 168 *et seq*) has committed to it the duty, but as contiguous property is supposed to reap the pecuniary benefit therefrom the cost indebtedness is spread upon such property by the assessors. The city must be a party to the contract, but its engagement in effect is to use the power conferred upon it to collect the tax, and the contractor must wait for his pay until the money has been received by the city in due course from the taxpayers.

The city protected itself from assuming any liability by the very clause which the plaintiff now contends vitiates the agreement. Give that its intended scope and the city never will be called upon to pay anything by virtue of this contract. No bond or other evidence of debt is given and it is not the case of a liability which is fixed upon the city upon the completion of the work, but its date of payment postponed.

The fund is to be created for the especial purpose of meeting the contract price of this improvement, so that there can never be any claim which can be enforced against the city, for the contractor relies upon this specific fund. (*Little* v. *City of Portland*, 26 Ore. 235; *Grant* v. *City of Davenport*, 36 Iowa, 396; *City of Springfield* v. *Edwards*, 84 Ill. 626.)

In *Tuttle* v. *Polk & Hubbell* (92 Iowa, 433) the city had issued its certificates to cover the expense of a street paving contract, although the cost of the improvement was to be paid by the benefited lot owners. The court, in discussing the effect the transaction had upon the city's debt limit under a similar prohibition to that now under review, say (p. 442):

"The paving of the streets is one of the purposes for which the city exists, and for which it might have assumed liability, had its debt not reached the constitutional limit, but it guarded against the assuming of any liability, and placed the burden of the improve-

ment upon the owners of property which fronted upon it. That right was given by a statute which was especially designed to authorize the making of such improvements without cost to the city, and we find nothing to prevent giving it full effect. We do not think there is any sufficient reason for holding that the city is in any respect liable for the amounts represented by the certificates, nor that the obligation of the taxpayer is the debt of the city."

If the city should issue warrants to these contractors upon the completion of their paving job payable out of this fund as it was collected from the taxpayers it would not be repugnant to the constitutional inhibition referred to. (*Davis* v. *City of Des Moines,* 71 Iowa, 500; *Kelly* v. *City of Minneapolis,* 63 Minn. 125; *Faulkner* v. *Seattle,* 19 Wash. 320; *Lansing* v. *Van Gorder,* 24 Mich. 456.)

From our examination of this subject we are, therefore, convinced that where the municipality has the funds on hand to meet the expenses of an improvement made or has, in the ordinary mode of procedure, provided by statute authority to raise the money by assesment and tax to meet the particular expenditure, and the compensation is to be paid from that fund, there is no infraction of the constitutional debt limitation, even though the sum to be paid overruns that boundary. We accordingly answer this question in the negative.

The value of the special franchises of the city of Rochester for the year 1901, pursuant to chapter 712, Laws of 1899, appears upon the assessment roll at the sum of $4,399,436. The query we are called upon to solve is whether these franchises are to be considered as part of the assessable real estate of the city in ascertaining the amount of its property upon which the ten per centum limitation is to be computed.

There are two classes of property recognized from time immemorial in the taxing statutes as well as in legal nomenclature, *i. e.*, real and personal. In the statutes prescribing the manner of assessments prior to the enactment of the law providing for the taxing of public franchises (Laws of 1899, chap. 712) the assessors were required upon their roll to preserve this distinction. The law referred to was an innovation in that it made assessable property theretofore not within the domain of the assessors. While it pro-

vided (§§ 2, 3, amdg. Laws of 1896, chap. 908, §§ 42, 21) that the valuation of this particular class of property for taxing purposes should be fixed by the State Board of Tax Commissioners, such valuation must be placed upon the assessment roll by the local assessors. Nor was there any omission to define in unmistakable language to which class of property it should belong. The title of the act which is significant in determining its meaning defines it as an amendment "in relation to the taxation of public franchises as real property."

In section 1 (amdg. Laws of 1896, chap. 908, § 2, subd. 3) occurs the definition of the interchangeable expressions, "land," "real estate," and "real property" and it is comprehensive and designed to include these public franchises within its scope. This franchise takes in "all surface, under ground or elevated railroads, including the value of all franchises, rights or permission to construct, maintain or operate the same in, under, above, on or through streets, highways or public places" (§ 1). It also embraces "the value of all franchises, rights, authority or permission to construct * * * or operate, in, under * * * or through any streets * * * or public places, any mains * * * tanks * * * or wires * * * for conducting water, steam * * * light * * * gas * * * or other substance," etc.

It is, therefore, very clear that the intent of the Legislature was to include this property in the general classification known as real estate or land. This franchise is defined in this statute to be a "special franchise," and that it shall "include the value of the tangible property" of the corporation above described, and that such "tangible property * * * shall be taxed as a part of the special franchise."

The point is urged that because of this denomination of the thing to be taxed, the property is not to be treated as real estate. The lawmakers in this important enactment did not carefully, in its title and in the act itself, provide these franchises were to be assessable as real property, and then explode their whole creation by defining the property to be a special franchise. If the Legislature should see fit to define what property is to be treated as vacant and what improved, and that each should be separately assessed, the character of the property would not be changed by the definition, and especially

would this be true if the Legislature circumspectly hedged against any such interpretation by declaring each to be real estate.

This new feature in the list of the taxable property must be named, and it must be separately assessed and not confounded with other property, even of the same general class, and the Legislature, by designating what it should be called, certainly did not change its generic quality so carefully defined in the act.

Again, it is to be observed that the Legislature did no violence to the settled principles of the law in designating these franchises as real property. They are inseparably connected with real estate and appurtenant to it like a fixture or an incorporeal hereditament, and the exercise of the privilege requires a disturbance of the soil of the physical body of the land. The statutory definition runs in harmony with that of the common law.

This property when assessed must be placed upon the assessment roll like other property, except that the value of it is fixed by and the hearing concerning it must be had before the State Board of Tax Commissioners. It, therefore, conforms to the requirement of the phrase, " real estate   *.   *   *   as it appeared by the assessment-rolls." (State Const. art. 8, § 10.)

We are of opinion, therefore, that the valuation of these franchises is to be taken into account in ascertaining the assessed value of the real estate of the city, for the purpose of determining whether there has been any infringement upon the constitutional interdiction referred to.

Included among the cash resources of the city are several distinct funds aggregating nearly $600,000. The fifth and sixth questions submitted to us for answer are whether these cash resources or any of them are to be deducted from the liability of the city in arriving at its indebtedness.

These funds are set apart pursuant to statutory authority in each instance, and as a rule to meet some lingering specific indebtedness against the city. If a fund is to be used to reduce the principal of a definite existing liability of the city, we think to that extent it should be deducted in estimating the city's liabilities. The outstanding liability toward the payment of which the fund is to be applied in any given case is included among the debts of the city for the purpose of ascertaining if it has reached its debt limit. The

sinking fund, therefore, which is to be used in diminishing it should be credited to the city upon the other side of the ledger.

We realize that when the indebtedness of an individual is mentioned the sum of his obligations, irrespective of the value of his assets, is intended. The individual may use his assets for any purpose he sees fit. The officials of the city intrusted with the control and application of a fund created for a definite purpose are charged with the duty of using it only for that purpose. A sinking fund invested for the purpose of paying water bonds must not be diverted for the payment of the salaries of officials of the city. It is to be used to reduce that particular debt which it came into existence to deplete, and hence in fact will lessen that liability to the full extent of the fund.

If the United States had in its treasury $100,000,000 to be devoted to the payment of certain bonds maturing ten years hence and representing part of its national debt, in every statement of the nation's indebtedness the amount would be lessened by said fund, for the reason that it could be used for no other purpose. We must assume this rule will be rigidly adhered to by those committed with the management of the city's finances in disposing of these various funds set apart for specific purposes.

We apprehend, however, this construction will not obtain where the cash resources may be used for any legitimate purpose, whether the obligation be already incurred or to be hereafter contracted. To illustrate, there is a fund among the cash resources denominated the local improvement fund. This money may be used for any local improvements, as there is no restriction upon its application by the municipality. A sum on hand to be devoted to general purposes in that way ought not to be deducted from the liability of the city in estimating its indebtedness, for it may not, in fact, be used to reduce the same. Therein we conceive lies the distinction.

We do not deem it necessary to go into detail and determine precisely what part of these funds is to be deducted and what part is not to be considered in making the estimate. The general principle we have enunciated can readily be made applicable to any given case whenever the exigency arises for its application, city officials being admonished to heed well the constitutional inhibition if doubt occur at any time.

The assessed valuation of the real estate of the city upon the roll for the year 1901, including the special franchises, is $107,303,311. The aggregate liabilities, without any deduction whatever for cash resources, is $10,787,832.03. It is conceded that from this sum should be deducted $100,000 for revenue bonds for taxes overdue within the last five years (State Const. art. 8, § 10), leaving the liabilities at $10,687,832.03. Ten per centum of the assets stated amount to $10,730,331.10. Without deducting any other items the city has not yet reached its debt limit.

It is claimed the award to Whitmore, Rauber & Vicinus was unauthorized, as they were not the lowest bidders for paving, although below any one for asphalt pavement. When the contract was awarded the said firm there was a petition on file duly and properly signed by the requisite number of property owners asking that this award be made. This was ample authority for the action of the board. Its members could not be expected to keep haltered the changing petition signers who on one day desired asphalt pavement and another trap rock and still later returned to their original desire. When the board took action the warrant of authority existed and that is the test.

The plaintiff is not entitled to judgment restraining the defendant mayor "from signing or executing the said contract or any contract based upon the said award for the paving of Fien street made by the Board of Contract and Supply to Whitmore, Rauber & Vicinus," but judgment should be awarded for the defendants.

McLennan, Williams, Hiscock and Davy, JJ., concurred.

Judgment ordered for the defendants, with costs. Order to be settled before Mr. Justice Spring on two days' notice.