FRANK H. HANRAHAN, Plaintiff, *v.* VINCENT R. CORROU, Mayor of the City of Utica, and Others, Defendants.

Supreme Court, Oneida County, August 23, 1938.

*Joseph A. Marion* [*Matthew Weimer* of counsel], for the plaintiff.

*Bartle Gorman, Corporation Counsel* [*Daniel Myers* of counsel], for the defendants.

*Milton D. Nelson,* for the town of Deerfield, *amicus curiæ.*

EDGCOMB, ERNEST I., Official Referee.   Plaintiff, a resident and taxpayer of the city of Utica, brings this action, pursuant to the provisions of section 51 of the General Municipal Law, to restrain the governing authorities of the said city from entering into ·or carrying out a contract to purchase the physical property, rights, privileges and franchises of the Consolidated Water Company for the sum of $7,900,000, upon the theory that the acts complained of are illegal, and will result in the waste of public funds.

The Consolidated Water Company supplies the city of Utica, and certain outlying towns and villages, with water obtained from different sources of supply.   Early in 1937 an offer was made upon behalf of the corporation to sell its plant to the city for $8,250,000. On March second of that year the mayor appointed a committee of ten members, five of whom were representative business men in no way connected with the city administration, to make an exhaustive study of the proposition, and to report its findings and recommendations.   Numerous meetings were had at which the advisability of the purchase was discussed from various angles. On June 28, 1937, the committee unanimously recommended to the mayor that the best interests of the city would be served by the purchase of the property of the water company " used and useful for water purposes," at a price not to exceed $7,900,000, provided:

" (1) That the purchase price shall include working capital in the amount of three hundred thousand dollars made up of net value of accounts receivable from consumers, un-billed consumers revenue, inventory of supplies and materials on hand, and the balance in cash.

" (2) That revenue bonds can be sold at not less than par, and at a rate not more than 3.125 per cent, and if the bonds cannot be sold at the above rate or less, that the working capital of three hundred thousand dollars be increased by the seller to four hundred thousand dollars.

" (3) That the Water Company turn over to the city all their right, title and interest in and to all moneys that have been or should have been impounded as per order of the Public Service Commission effective August 1, 1933, less such State and Federal Taxes, levies, and assessments to which said company may be or

'may become liable, by reason of the earning, owning, holding or accumulation of said funds. The above funds to be turned over to the city irrespective of the ultimate decision of the Court in regard to the rate case."

On July 7, 1937, the common council adopted a resolution declaring its intention to buy the property of the company " used and useful for water purposes," and on September 1, 1937, taking advantage of the method specified in section 404 of the General Municipal Law to finance said purchase, adopted a further resolution authorizing the issuance of water revenue bonds of the aggregate par value of $7,900,000, the same to be sold at not less than par to the United States of America, or an agency or instrumentality thereof, at a rate of interest not to exceed three and one-eighth per cent. The plaintiff seeks the aid of this court to restrain and prevent the carrying out of this purchase and the issuance of these bonds.

In enacting section 51 of the General Municipal Law, authorizing a taxpayer, under certain specified conditions, to prosecute an action restraining a municipal official from doing an unlawful act which will occasion waste or injury to the funds of the municipality of which he is an officer, it was not intended by the Legislature to give to the court the right to sit in judgment upon questions of administrative discretion. Such power would impair the right of home rule. Public officials are responsible to the people for the faithful performance of their duties as well as the propriety and wisdom of the policy which they adopt. In the absence of illegality, fraud, collusion, corruption or bad faith, the court has no power to restrain the city from entering into or carrying out any agreement which it chooses to make. The terms " waste " and " injury," as used in the statute, comprehend only wrongful, dishonest or illegal official acts, and are not intended to subject the action of an administrative official, acting within the limits of his authority and jurisdiction, to the scrutiny and control of a judicial tribunal. The court has no power or authority, much less the disposition, to regulate or superintend the official acts of one holding a civil appointment or to make itself the arbiter of a dispute between some dissatisfied taxpayer and the municipal authorities as to the advisability or wisdom of entering into some particular contract. (*Campbell* v. *City of New York*, 244 N. Y. 317, 328; *Kelly* v. *Merry*, 262 id. 151, 160; *Talcott* v. *City of Buffalo*, 125 id. 280; *Zeigler* v. *Chapin*, 126 id. 342, 348; *Martens & Co., Inc.*, v. *City of Syracuse*, 183 App. Div. 622, 628; *Dunning* v. *County of Orange*, 139 id. 249, 251; affd., 204 N. Y. 647; *Daly* v. *Haight*, 170 App. Div. 469, 471, 472; affd., 224 N. Y. 726; *Govers* v. *Board of Supervisors*, 55 App. Div.

40, 43; affd., 171 N. Y. 403; *Pilbeam* v. *Sisson*, 204 App. Div. 762, 766; *Hearst* v. *McClennan*, 102 id. 336, 338.)

" Whatever evils may exist in the government of cities that are due to mistakes, errors of judgment or the lack of intelligent appreciation of official duty, must necessarily be temporary, compared with the mischief and inconvenience which judicial supervision, in all cases, would ultimately produce. Local officers are elected or appointed for such brief periods that frequent opportunity is afforded to the public and the taxpayers interested in their official acts, to change them and substitute others in their place." (*Talcott* v. *City of Buffalo*, 125 N. Y. 280, 288.)

With these limitations upon the authority of the court to intervene and put a stop to the contemplated action of the city, we approach the claims of the plaintiff in an effort to determine whether he has brought himself within the provisions of the statute and has shown himself entitled to the relief which he seeks.

Plaintiff asserts that there is no authority in law which will permit the city to enter into the contract in question. I cannot agree with such contention. Section 403 of the General Municipal Law gives to a municipality, in addition to the powers which it otherwise has, the right to acquire by gift, purchase, or the exercise of the right of eminent domain, any undertaking defined in section 401 of the act and to issue its revenue bonds to finance in whole or in part the acquisition of such property. The term " undertaking " is declared to include " systems, plants, works, instrumentalities and properties used or useful in connection with the obtaining of a water supply and the collection, treatment and disposal of water for public and private uses."

Plaintiff calls attention to the words " used or useful " contained in this definition of an undertaking, and asserts that a portion of the property which the city proposes to purchase is neither " used " or " useful " in connection with the company's water system, and serves no purpose whatsoever in supplying the territory served with water, and that, consequently, the contemplated action of the city is without the sanction of the statute.

It is true that some of the land now owned by the water company, and which the city intends to purchase, is not used at present by the company for any purpose connected with its service to the city and the contiguous territory. It is quite possible that a part of such property will never be employed for such purpose again. The company owns several hundred pieces of real estate in Oneida and Herkimer counties, numerous reservoirs, a network of supply mains and distribution lines, and various water rights. Former sources of supply have become more or less contaminated and

have been abandoned, and several of the reservoirs are lying idle at the present time. The word "useful" is a broad and comprehensive term. What one person finds available another will cast aside as worthless. What is useful is largely a matter of judgment. We may guess that certain of the lands now owned by the company have outlived their usefulness, but there is no absolute assurance that they will not prove beneficial in the future for some purpose connected with the distribution of pure and wholesome water in the territory served.

But if we were to give the plaintiff the benefit of the doubt and concede that a portion of the property to be conveyed to the city is no longer "used or useful," the value of such property is so small and insignificant as compared with the purchase price of the whole, $7,900,000, that it is inconceivable that the Legislature ever intended to condemn the whole contract because an infinitesimal part of the property did not come within the strict and technical interpretation of the property authorized to be acquired. The statute should be given a reasonable construction — one which will not lead to an absurd result.

The resolution adopted by the common council on July 7, 1937, declared its intention to purchase all the property owned and operated by the water company in connection with its water system "used and useful for water purposes." That was the property which the special committee in its report to the mayor recommended should be acquired. The city engineer was instructed by the council to prepare a list of such property, and in so doing included everything owned by the company without exception. Then for the first time a dispute arose between the purchaser and the seller as to certain parcels of land, one insisting that they were usable, and, therefore, a part of the property to be conveyed, and the other claiming the contrary. Finally the company agreed to include all its possessions and to end a dispute which was trivial in comparison with the amount involved. The city, therefore, became the gainer, and obtained every parcel of land owned by the corporation, even if, perchance, it was not used or useful, at the same price which it had agreed to pay for the property which was concededly available for the purposes of the company. Under these circumstances it cannot be claimed that this contract is illegal or that the city is exceeding the powers granted to it by article 14-C of the General Municipal Law.

Nor can it be successfully urged that the contract was tainted with fraud, corruption, collusion or bad faith. Plaintiff does not claim that any city official was guilty of fraud or corruption, except as fraud may be inferred from the nature and circumstances of

the transaction as being an imposition and deceit on the public. He asserts, however, that there was bad faith on the part of the defendants in entering into this agreement, and bases such claim upon the assertion that the city is paying such an exorbitant and excessive price for the property that want of good faith will be presumed; he urges that fraud is apparent from the very nature of the bargain itself.

The property of the company for rate-making purposes was appraised by the Public Service Commission in 1932 at $5,850,000. Plaintiff urges that the value thus fixed should be taken as the present worth of the property, and that by agreeing to pay $2,050,000 more than such amount, and by so utterly disregarding the interest of the public, the defendants are not only squandering the money of the city but are evidencing bad faith. Plaintiff also claims that the contract in question is unjust and unconscionable from the standpoint of the taxpayers of the city, and that it exceeds all just and reasonable limits, because much of the company's property is useless and obsolete, and large sums will have to be expended in the near future for renewals and replacements. In its estimate of expenses under municipal ownership the committee has allowed $71,000 for renewals and replacements, which is approximately $400 less than the actual amount expended by the company in 1936 for that purpose. Plaintiff insists that this item is out of all proportion to what will actually have to be expended in the immediate future. It is said that a second supply line will have to be installed from the Hinckley Reservoir and that a considerable portion of the company's distribution line will have to be replaced on account of the large amount of leakage which has taken place since 1931, which ranges from 1,000,000,119 gallons in 1931 to 1,000,000,800 gallons in 1935, or approximately thirty per cent of the total amount of water flowing into the company's supply mains. Plaintiff also urges that in other respects the contract is so palpably unreasonable and so utterly unjustified that it should be condemned as being conceived in iniquity.

Of course, the city officials should make the best bargain reasonably possible for the acquisition of this property. If the purchase price is $2,000,000 more than it is clearly worth, and if the authorities having the matter in charge knew, or, as reasonable men, should have known that fact, or if the contract is so unconscionable and unjustified from the standpoint of the public that its overwhelming disadvantages to the city are clearly apparent, the court would have no hesitancy in stamping the whole transaction as one consummated in bad faith. Want of good faith and honest motives on the part of the municipal authorities will be presumed from a reckless and wanton disregard of the taxpayers' interests.

The plaintiff has failed to convince me that the city officials were moved by improper motives when they took the action which has been criticized here. During all of the negotiations for the purchase of the property the city had the advantage of the counsel and advice of the mayor's special committee. As before, noted, five of its members are prominent business men, and have no interest except to promote the city's welfare. True, the committee did not employ an expert to make another appraisal of the property. It relied very largely upon the report of the Public Service Commission in the rate case and the advice of the city engineer as to the recently-acquired property and its value, as well as the present reproduction cost of the entire plant. The evidence shows that land values, as well as prices of labor and material, have increased since the appraisal of the Public Service Commission, and that the company has made capital improvements amounting, in the opinion of the committee, to $267,000. Making proper allowances for these items, and deducting the value of all property abandoned since the decision in the rate case, the committee estimated the value of the entire property to be purchased, as of June, 1937, to be $7,500,000. The city will acquire, in addition, $300,000 working capital. No one can gainsay that in the purchase of property of this magnitude an agreement to pay $100,000 more than the property is estimated to be worth indicates any lack of morals or bad faith, especially when the buyer deems it to be to its advantage to acquire the property and honestly believes that it can recoup the $100,000 in other ways. It may be that the committee is mistaken in its estimate; it may be that the transaction will not turn out as advantageously for the city as those interested in the project expect; it is possible that the expenses connected with future improvements will run the enterprise up to such a sum that the revenues paid into the city will be insufficient to meet the bonds as they become due and to pay the interest. The contract may be ill-advised. Time alone will tell. But if the city and its officers were acting in good faith the court will not attempt to pass upon the wisdom of the purchase. That responsibility rests upon the municipal authorities.

Defendants are entitled to the presumption that their decision to purchase this property was based upon adequate information and that they were influenced by proper motives. (*Matter of City of New York* [*Ely Ave.*], 217 N. Y. 45; *McCabe* v. *City of New York*, 213 id. 468, 480, 481.)

Such presumption has not been overcome. There is no evidence which would warrant a finding of bad faith on the part of the mayor or the common council.

But there is another reason why I think that the plaintiff cannot recover. The property which the city is about to purchase is to be paid for out of the proceeds derived from the sale of revenue bonds, which are made payable out of the water rates received by the city, and not out of any other fund. No money is to be raised by taxation to retire these obligations or to pay the interest as it falls due. The bonds are a prior and paramount lien on the income derived from the undertaking; they are not a debt of the municipality. The city is not liable upon the obligation. The bonds are not even a lien on the property purchased. (Gen. Mun. Law, §§ 407, 408.)

Under these circumstances the contemplated transaction will not entail any waste or injury to the city or to its taxpayers, and section 51 of the General Municipal Law, under which the plaintiff is proceeding, has no application. (*Kelly* v. *Merry*, 262 N. Y. 151; *Kronsbein* v. *City of Rochester*, 76 App. Div. 494; *Robertson* v. *Zimmermann*, 268 N. Y. 52.)

It neccessarily follows that the complaint should be dismissed, with costs.

Prepare findings and submit to me for my signature.'