OPINION OF THE COURT
Joseph G. Makowski, J.
Factual and Procedural Background
Petitioners, Pastor Keith H. Scott, Sr., Dora Richardson, Josephine Rush, John and Shelley McKendry, and Geoffrey D. Butler (hereinafter referred to as petitioners), either live or work along Periy Street in the City of Buffalo, New York. Petitioners live or work within two blocks of nine acres of land purchased by the Seneca Nation of Indians in the fall of 2005 for the development of a class III gaming casino. The nine acres of land owned by the Seneca Nation of Indians in restricted fee status are bounded by Marvin Street, South Park Avenue, Michigan Avenue and Perry Street in the City of Buffalo. The Seneca Nation of Indians (hereinafter referred to as the Nation) is not a party to this CPLR article 78 proceeding.
Since assuming ownership, the Nation has undertaken certain construction, demolition and related development activities to clear the nine-acre site for development as a class III gaming casino. The authority of the Nation to conduct demolition activity within the nine acres owned by it was the subject of injunction proceedings before the court in May 2006. At that time, the court declined to grant a preliminary injunction enjoining the Nation from demolishing a grain mill located on the nine-acre parcel.
Earlier this year, the Nation requested the City of Buffalo to abandon and sell Fulton Street right-of-way (Fulton Street ROW) to it in order to allow fulfillment of development plans for construction of its class III gaming casino. Fulton Street is a public street situate immediately adjacent to the nine acres owned by the Nation. Following a period of protracted negotiation, the City of Buffalo and the Nation entered into an agreement for the sale of Fulton Street ROW for an agreed price of $631,000. Under the terms of the agreement, the City of Buffalo also agreed to provide sewer and water service to the Buffalo Creek Territory and to make available certain emergency services. In consideration of the agreement, the Nation agreed to *261 undertake certain actions, including: spending between $5 million and $7 million making infrastructure improvements to City-owned lands around the Buffalo Creek Territory; integrating the class III gaming casino structure with the surrounding community and building of an urban park; employing approximately 1,000 people at the casino and the grant of a preference to City of Buffalo residents for 50% of these jobs and the recruitment high in unemployment areas; abiding by a policy of trying to have a work force of at least 25% minorities and at least 8% women; marketing the casino beyond the Western New York region; and not acquiring additional property for casino operations.
The agreement between the City and the Nation for the sale of Fulton Street was required, under the Charter of the City of Buffalo, to be approved by a two-thirds vote of the Buffalo Common Council. On October 31, 2006, by a vote of six to three, the Common Council of the City of Buffalo, among other things, adopted a resolution entitled “Abandonment and Sale of Fulton Street and Approval of Proposed Agreement between the City of Buffalo and the Seneca Gaming Corporation, the Seneca Erie Gaming Corporation and the Seneca Nation of Indians.” (Lukasiewicz affidavit, exhibit 2.)
In approving the agreement for the sale of Fulton Street, the Common Council, on October 31, 2006, by a vote of six to three, adopted a resolution entitled “Determination of Significance Pursuant to the State Environmental Quality Review Act” for the abandonment and sale of Fulton Street ROW A copy of this resolution referred to as “Determination of Significance” as well as supporting documentation is attached as exhibit 1 to the Lukasiewicz affidavit. With the approval of the Common Council of the City of Buffalo, the sale of Fulton Street ROW is scheduled for approval by the Buffalo Fiscal Stability Authority on November 9, 2006. Assuming the Buffalo Fiscal Stability Authority approves the sale of Fulton Street ROW by the City of Buffalo to the Nation, the matter will then be referred to the Tribal Council of the Nation for approval. Such action is contemplated on November 9, 2006.
On October 26, 2006, the court issued an order to show cause as to why petitioners should not be granted a preliminary injunction enjoining the respondents from (1) taking any actions toward approval or acting upon the proposed agreement for the sale of Fulton Street ROW between the City of Buffalo and the Nation, Seneca Gaming Corporation, and Seneca Erie *262 Gaming Corporation; (2) enjoining respondents from taking any steps toward the transfer of that property commonly known as Fulton Street between Michigan Avenue and Marvin Street and/or any rights pertinent thereto or easements, authority, permissions to the Nation, Seneca Gaming Corporation, Seneca Erie Gaming Corporation and/or any other body or party until such time as this article 78 proceeding before the court is resolved; and (3) compelling respondents to undertake an appropriate environmental review, including but not limited to, preparation of a complete environmental assessment form, preparation of a draft environmental impact statement (EIS) followed by an appropriate public comment, an issuance of a final environmental impact statement prior to making any findings with regard to the proposed agreement and/or transfer of said Fulton Street ROW.
The matter was returnable before the court on October 30, 2006. On October 30, 2006, respondents filed a motion in response to the order to show cause requesting dismissal of petitioners’ motion and sanctions pursuant to 22 NYCRR 130-1.1. The court offered respondents the opportunity to file supplemental papers on or before November 2, 2006. Respondents have filed said supplemental papers, including an affidavit of Alisa Lukasiewicz, Corporation Counsel of the City of Buffalo, and a supplemental memorandum of law. On November 3, 2006, petitioners filed the reply affidavit of Robert Knoer, Esq., and a supplemental memorandum of law. On November 6, 2006, the court heard extensive oral argument on petitioners’ motion for a preliminary injunction. Following oral argument, the court reserved decision. For the reasons cited herein, the court denies petitioners’ application for a preliminary injunction. The reasons for the court’s decision denying petitioners’ application for injunctive relief are set forth herein.
Standing
Respondents contend that petitioners lack standing to seek State Environmental Quality Review Act (hereinafter referred to as SEQRA) claims because petitioners are not within sufficient “close proximity” to the proposed site, nor do they allege specific environmental injury which is “in a way different from the community at large.” (Matter of Sun-Brite Car Wash v Board of Zoning & Appeals of Town of N. Hempstead, 69 NY2d 406, 413-414 [1987].)
In Matter of King v County of Monroe (255 AD2d 1003 [4th Dept 1998]), the Court found petitioners had standing to chai *263 lenge a SEQRA process undertaken by Monroe County where petitioner resided directly across the street from the proposed project and alleged that her property would suffer environmental harm as a result of the project. (Id., citing Matter of Gernatt Asphalt Prods. v Town of Sardinia, 87 NY2d 668, 687 [1996]; Matter of LaDelfa v Village of Mt. Morris, 213 AD2d 1024, 1025 [1995]; see generally Matter of Brighton Residents Against Violence to Children v MW Props., 304 AD2d 53, 56-57 [4th Dept 2003].)
On the record before the court, petitioners reside within two blocks of the Nation’s proposed class III gaming casino. In light of the geographic proximity of the petitioners to the nine-acre site of the Nation’s proposed class III gaming casino and Fulton Street, this court determines that petitioners have standing to bring the SEQRA claims.
Standard of Review
Petitioners attack the “negative declaration” issued by the Common Council on October 31, 2006 in its resolution entitled “Determination of Significance Pursuant to the State Environmental Quality Review Act (SEQRA) for the Abandonment and Sale of Fulton Street and the Proposed Agreement Between the City of Buffalo and the Seneca Gaming Corporation, the Seneca Erie Gaming Corporation and the Seneca Nation of Indians.” (Lukasiewicz affidavit, exhibit 1.) Specifically, petitioners maintain the “negative declaration” adopted by the Common Council constituted an impermissible segmented environmental review limited to the sale of Fulton Street which failed to address the class III gaming casino contemplated by the Nation on the adjacent nine acres of land owned by it in the city.
In substance, petitioners maintain that the Common Council performed a segmented environmental review limited to the environmental effect of the sale of Fulton Street without adequately considering the issue of the environmental effect which the Nation’s construction of a class III gaming casino would have on them. Petitioners maintain the contemplated class III gaming casino constitutes a Type I action under SE-QRA and a comprehensive environmental review of the entire project is required by the City. (6 NYCRR 617.4.) In response to this contention, respondents maintain that the right of the Nation to build a class III gaming casino, within the city of Buffalo, is settled under the terms of Executive Law § 12 and the compact between the State of New York and the Nation. Respondents maintain that since the Nation owns the nine acres of land at issue, it cannot be compelled to comply with SEQRA.
*264 Respondents maintain that, in connection with the proposed sale of Fulton Street ROW, segmented review of the impact of the sale is all that they may be feasibly compelled to do. Without addressing whether the Nation’s class III gaming casino constitutes a Type I or Type II action, respondents maintain that under no circumstance can they compel the Nation to comply with SEQRA in performing any environmental review.
Although not raised in the papers, the court notes that the New York State Legislature, in enacting Executive Law § 12 which authorized Governor Pataki to enter into a compact with the Nation for three class III gaming casinos in the city of Niagara Falls, the city of Buffalo, and Cattauraugus county, did not expressly mandate that an environmental impact statement under SEQRA be performed as a condition of building a class III gaming casino. Notwithstanding this, the respondents acknowledge, by their negative declaration, that environmental review is required in connection with the City’s sale of Fulton Street ROW to the Nation.
The standard of review of the court of the actions taken by the Common Council in issuance of a negative declaration segmented as to Fulton Street ROW is limited. In Chinese Staff & Workers Assn, v City of New York (68 NY2d 359, 363 [1986]), the Court recited:
“In reviewing administrative proceedings in general and SEQRA determinations in particular, we are limited to considering ‘whether a determination was made in violation of lawful procedure, was affected by an error of law or was arbitrary and capricious or an abuse of discretion’ (CPLR 7803 [3]). As we stated in Matter of Jackson v New York State Urban Dev. Corp. (67 NY2d 400, 416), ‘it is not the role of the courts to weigh the desirability of any action or choose among alternatives, but to assure that the agency itself has satisfied SEQRA, procedurally and substantively’.”
The role of the court is to determine whether respondents complied or failed to comply with SEQRA, or “the body or officer failed to perform a duty enjoined ... by law” or a “determination was made in violation of lawful procedure.” (CPLR 7803 [1], [3].)
SEQRA provides that no state or local governmental agency may undertake, fund or approve an action unless and until that agency has performed an adequate environmental review *265 consisting of an evaluation of the nature, type, size and scope of the action and an assessment of whether the action has the potential to have a significant environmental impact. (ECL 8-0109 et seq.; 6 NYCRR part 617.) The purpose of SEQRA is plain: to require agencies to incorporate environmental considerations directly into their decision making and, where necessary, to modify that action to mitigate adverse environmental effects. (Matter of Coca-Cola Bottling Co. of N.Y. v Board of Estimate of City of N.Y., 72 NY2d 674, 679 [1988]; Matter of Billerbeck v Brady, 224 AD2d 937, 938 [4th Dept 1996].)
SEQRA itself does not set forth the standard courts are to apply in reviewing an agency’s substantive SEQRA compliance. Nevertheless, over the years, the Court of Appeals has articulated a consistent set of standards for judicial review of an agency’s substantive SEQRA obligations:
“[W]e do not decide here whether an EIS is required prior to the construction of [the project] or what environmental impacts may flow from that construction. The limited issue presented for our review is whether the respondents identified the relevant areas of environmental concern, took a ‘hard look’ at them, and made a ‘reasoned elaboration’ of the basis for their determination.” (Chinese Staff & Workers Assn. v City of New York, 68 NY2d 359, 363-364 [1986]; see also, Matter of Jackson v New York State Urban Dev. Corp., 67 NY2d 400, 416 [1986] [courts must determine whether a SEQRA determination was made in violation of lawful procedure, was affected by an error of law, or was arbitrary and capricious or an abuse of discretion].)
“In reviewing a lead agency’s compliance with SE-QRA, a court does not ‘weigh the desirability of [the] action’ or determine what, if any, adverse environmental effects may result from it. . . . [A]s contrasted, for example, with a court’s review of the grant or denial of a variance or special permit — the merits of the action and its ultimate impact on the petitioning party or others are not in question. The limited issue for review is whether the decision makers identified the relevant areas of environmental concern, took a ‘hard look’ at them, and made a ‘reasoned elaboration’ of the basis for their determination.” (Matter of Har Enters, v Town of Brookhaven, 74 NY2d 524, 528-529 [1989] [citation omit *266 ted].)
The Court of Appeals also has cautioned courts from acting as a super-legislature in overruling the discretion of agencies:
“While judicial review must be meaningful, the courts may not substitute their judgment for that of the agency for it is not their role to ‘weigh the desirability of any action or [to] choose among alternatives’ . . .
“Since it is not the court’s role to evaluate de novo the data presented to the agency, the court must, as with substantive SEQRA obligations generally, be guided by a rule of reason and refrain from substituting its judgment for that of the agency.” (Akpan v Koch, 75 NY2d 561, 570-571 [1990].)
A court’s review of the administrative action in a SEQRA case is limited to the record made before the agency. (Matter of City of Saratoga Springs v Zoning Bd. of Appeals of Town of Wilton, 279 AD2d 756, 760 [3d Dept 2001].). Not every conceivable environmental impact mitigating measure or alternative need be addressed in order to meet an agency’s responsibility under SEQRA; the degree of detail and the reasonableness of the agency’s action will depend largely on the circumstances surrounding the action. (Matter of Neville v Koch, 79 NY2d 416, 424 [1992]; Har Enters., 74 NY2d at 530.) A negative declaration is properly issued when the agency has made a thorough investigation of the problems involved and reasonably exercised its discretion. (Matter of Spitzer v Farrell, 100 NY2d 186, 190 [2003].) With these standards in mind, the court analyzed the substance of petitioners’ SEQRA claims.
The Common Council Negative Declaration of October 31, 2006
Petitioners argue that the Common Council impermissibly segmented the environmental review for the City actions from the Seneca actions. (Petitioners’ mem at 21-24.) An evaluation of the record shows that the Common Council evaluated the facts and circumstances concerning the Seneca actions and the City actions and concluded that segmenting the City actions from the Seneca actions was appropriate and in compliance with the requirements of SEQRA.
Segmentation is defined as the division of the environmental review for an action such that various activities or stages are addressed under SEQRA as though they were independent, unrelated activities. (Matter of Forman v Trustees of State Univ. of N.Y., 303 AD2d 1019, 1019 [4th Dept 2003]; see also, Stewart *267 Park & Reserve Coalition, Inc. (SPARC) v Slater, 225 F Supp 2d 219, 232 [ND NY 2002]; Matter of City of Buffalo v New York State Dept, of Envtl. Conservation, 184 Misc 2d 243, 250 [Sup Ct, Erie County 2000].)
As recited by the Court in Forman-.
“Segmentation is disfavored, based on two perceived dangers. ‘First is the danger that[,] in considering related actions separately, a decision involving review of an earlier action may be “practically determinative” of a subsequent action .... The second danger occurs when a project that would have a significant effect on the environment is broken up into two or more component parts that, individually, would not have as significant an environmental impact as the entire project or, indeed, where one or more aspects of the project might fall below the threshold requiring any review’.” (303 AD2d at 1019, quoting Matter of Concerned Citizens for Envt. v Zagata, 243 AD2d 20, 22 [1998].)
SEQRA requires a lead agency to consider all “reasonably related long-term, short-term, direct, indirect and cumulative impacts, including other simultaneous or subsequent actions which are: (i) included in any long-range plan of which the action under consideration is a part; (ii) likely to be undertaken as a result thereof; or (iii) dependent thereon.” (6 NYCRR 617.7 [c] [2]; see also, ECL 8-0109 [2]; Sun Co. v City of Syracuse Indus. Dev. Agency, 209 AD2d 34, 47 [4th Dept 1995], appeal dismissed 86 NY2d 776 [1995].)
The SEQRA Handbook, a publication of the Department of Environmental Conservation (DEC), establishes a number of factors that should be considered by a lead agency in determining whether two activities should be considered as a single action for purposes of an environmental review:
1. Purpose: Is there a common purpose or goal for each segment?
2. Time: Is there a common reason for each segment being completed at or about the same time?
3. Location: Is there a common geographic location involved?
4. Impacts: Do any of the activities being considered for segmentation, while not necessarily significant by themselves, contribute toward significant cumulative or synergistic impacts?
5. Ownership: Are the different segments under the same ownership or control?
*268 6. Planning: Is a given segment a component of an identifiable overall plan?
7. Utility: Can any of the interrelated phases of various projects be considered functionally dependent on each other?
8. Inducement: Does the approval of one phase or segment commit the agency to approval of other phases?
If different activities are sufficiently related based on the enumerated DEC factors, a single environmental review is generally required. However, such cumulative review is not required — and a segmented review is permissible — if a lead agency believes that segmentation is warranted under the circumstances, provided that the agency: (i) clearly states its reasons therefor, and (ii) demonstrates that a segmented review will be no less protective of the environment. (Matter of Concerned Citizens for Envt. v Zagata, 243 AD2d at 22; 6 NYCRR 617.3 [g] [1].) As the Court explained in Zagata (at 22):
“It is clear that segmentation, which is the dividing for environmental review of an action in such a way that the various segments are addressed as though they were independent and unrelated activities, is contrary to the intent of SEQRA and is disfavored . . . Nevertheless, segmented review is permissible where the lead agency believes that it is warranted under the circumstances, provided that the agency clearly states its reasons therefor and demonstrates that such review is no less protective of the environment. Additionally, the related actions must be identified and discussed to the fullest extent possible.”
SEQRA requires review of an entire set of activities or steps that constitute a project, whether the agency decision making relates to the project as a whole or to only part of it. On the record before the court (LUK000005), the Common Council evaluated whether the City actions and the Seneca actions should be treated as related actions for purposes of SEQRA. Applying the DEC factors to the information known about each set of activities, the Council determined:
“The Proposed Agreement, discussed extensively herein, will embody certain assurances relative to the construction and operation of the Casino by the Senecas. In addition, the abandonment and sale of the Fulton St. ROW will affect the options available to the Senecas for the construction of the Casino. *269 Moreover, the Proposed Agreement provides that the Senecas will build a 220,000 square foot casino with a specialty restaurant, a 24 hour casual dining restaurant, a multi-purpose room, retail stores and a 2500 space parking garage substantially in accordance with the design that was publicly unveiled on or about June 1, 2006 with an aggregate capital investment by SEGC of at least $125,000,000 and which will include 1900-2200 slot machines and 30-50 table games. As such, the adoption and implementation of Proposed Agreement and the construction and operation of the Casino are related actions pursuant to SEQRA.” (LUK000005.)
Having found that the City actions and the Seneca actions were sufficiently related based on DEC’S factors to warrant a single environmental review, the Common Council next considered whether segmentation would be appropriate. The Common Council of the City of Buffalo stated:
“[A]n environmental review for the construction and operation of the Casino presents a unique challenge. The purpose of a SEQR review is to incorporate environmental considerations directly into governmental decision-making and to mitigate adverse environmental impacts to the maximum extent practicable. The Nation-State Gaming Compact between the Seneca Nation of Indians and the State of New York allows the Nation to establish the Casino in the City without any approval or review from the City. The Senecas have already taken the Buffalo Creek Territory in restricted fee status and are free to construct and, in fact, are already constructing the Casino without any approvals, permits or authorizations from the City. Accordingly, while the City could undertake a study to assess environmental impacts associated with the construction and operation of the Casino, the City cannot require the Senecas to mitigate potential adverse environmental impacts relative to the Casino, nor can it require the Senecas to consider reasonable alternatives.” (LUK000005.)
The Common Council deemed segmentation of the environmental review for the City actions and the Seneca actions appropriate under the circumstances as its only reasonable choice. (LUK000001.)
Next, the Common Council examined whether segmentation is no less protective of the environment. As explained in detail *270 in the Determination of Significance, the Common Council found that there were a number of reasons why performing a segmented review of the City actions was no less protective of the environment (LUK000009). One such reason was that the City actions would eliminate or mitigate adverse environmental impacts associated with the Seneca actions:
“The City has utilized the Senecas’ desire to obtain the Fulton St. ROW as a means to place some limitations upon the Seneca’s construction and operation of the Casino and to try to mitigate potential adverse environmental and economic impacts that the Senecas would not otherwise be required to address. Limitations and/or mitigation which the Proposed Agreement secures for the citizens of Buffalo include both binding covenants as well as declarations of good faith including among other things, that the Senecas will: (i) spend between $5 to $7 million making infrastructure improvements to City-owned lands around the Buffalo Creek Territory including major traffic handling improvements; (ii) integrate the Casino structures with the surrounding community and include an urban park on the site; (iii) employ approximately 1,000 people at the Casino and give preference to City of Buffalo Residents for 50% of these jobs and will recruit in high unemployment areas; (iv) abide by a policy of trying to have a workforce composed of at least 25% minorities and at least 8% women; (v) market the Casino beyond the Western New York Region in order to help minimize adverse local economic impacts and (vi) not acquire additional property around the Buffalo Creek Territory for Casino operations.” (LUK000005-6.)
The Common Council also noted that the City had maximized the mitigation it could get from the Senecas relative to the casino: “These conditions are the limit to what the City has been able to negotiate with the Senecas and the City does not have the ability to place any further conditions upon the Senecas’ construction or operation of the Casino.” (LUK000006.)
Finally, the Common Council explained that reviewing the impacts of the Seneca actions would serve no useful purpose under SEQRA:
“[Pjerformance of an environmental review which includes the construction and operation of the *271 Casino by the City would not serve any useful purpose. The City has obtained all mitigation it can relative to the construction and operation of the Casino and it is therefore reasonable to segment the environmental review for the adoption and implementation of the Proposed Agreement from the construction and operation of the Casino. Segmenting the environmental review for the Proposed Agreement from the construction and operation of the Casino is no less protective of the environment because the actions of the City as provided for in the Proposed Agreement will not determine whether the Senecas site a Casino on the Buffalo Creek Territory. Such decision has been made and the City of Buffalo is powerless to stop it.” (LUK000006.)
In evaluating whether segmentation was appropriate, the Council also examined the reasons that segmentation is disfavored and analyzed whether, in this unique circumstance, segmentation could be performed without running afoul of SE-QRA’s basic policies:
“Segmentation is disfavored based on two perceived dangers. First is the danger that in considering related actions separately, a decision involving review of an earlier action may be practically determinative of a subsequent action. While the adoption and implementation of the Proposed Agreement will be practically determinative of some aspects of Casino construction and operation, those aspects involve conditions, established through the Proposed Agreement, that are designed to limit the potential adverse social, economic and environmental impacts of the Casino upon the City of Buffalo and its citizens.
“The second danger of segmentation occurs when a project that would have a significant effect on the environment is broken up into two or more component parts that, individually, would not have as significant an environmental impact as the entire project, or indeed, where one or more aspects of the project might fall below the threshold requiring any review. That is not the case here. As discussed extensively herein, the potential environmental impacts of the adoption and implementation of the Proposed Agreement have been studied extensively pursuant to SEQR.” (LUK000006.)
*272 Accordingly, after performing an investigation of segmentation and evaluating the circumstances associated with the Seneca actions and the City actions, the Common Council determined that the City actions could properly be segmented from the Seneca actions for purposes of SEQRA:
“As the City does not have the jurisdiction to impose environmental mitigation or require abatement of adverse environmental impacts upon the Senecas relative to the construction and operation of the Casino, that activity will be segmented, as expressly authorized by SEQR, from the adoption and implementation of the Proposed Agreement.” (LUK000006.)
On the record before the court, the Common Council evaluated the segmentation issues and came to its conclusion as to the reasonableness of segmentation. The Common Council’s “Determination of Significance” includes an identification and discussion of the City actions and Nation actions and clearly articulates the Common Council’s rationale for segmentation. Although generally disfavored under SEQRA, segmented environmental review of projects has been approved by New York State courts. (See, Matter of Concerned Citizens for Envt. v Zagata, 243 AD2d at 21, 22 [3d Dept 1998]; Matter of Settco, LLC v New York State Urban Dev. Corp., 305 AD2d 1026 [4th Dept 2003].)
In Zagata (at 22), the Court permitted segmented environmental review by the DEC of a project and recited the standard governing segmented review thus:
“It is clear that segmentation, which is the dividing for environmental review of an action in such a way that the various segments are addressed as though they were independent and unrelated activities, is contrary to the intent of SEQRA and is disfavored (see, 6 NYCRR former 617.3 [k] [1]). Nevertheless, segmented review is permissible where the lead agency believes that it is warranted under the circumstances, provided that the agency clearly states its reasons therefor and demonstrates that such review is no less protective of the environment. Additionally, the related actions must be identified and discussed to the fullest extent possible (see, ibid.).
“Insofar as is relevant to this appeal, the reasons for disfavoring segmentation are twofold. First is the danger that in considering related actions *273 separately, a decision involving review of an earlier action may be ‘practically determinative’ of a subsequent action (Matter of Tri-County Taxpayers Assn, v Town Bd., 55 NY2d 41, 46). The second danger occurs when a project that would have a significant effect on the environment is broken up into two or more component parts that, individually, would not have as significant an environmental impact as the entire project or, indeed, where one or more aspects of the project might fall below the threshold requiring any review (see, Matter of Schultz v Jorling, 164 AD2d 252, 255-256, lv denied 77 NY2d 810).”
In Settco (supra at 1026, 1027), the Fourth Department addressed an alleged improper segmentation and inadequacy of environmental review in connection with the issuance of a negative declaration of environmental significance concerning the Seneca Nation casino in Niagara Falls, New York. The Court recited:
“We conclude that there was no improper segmentation of environmental review. The legally mandated conveyance of title to the former convention site for redevelopment as an Indian casino is specifically exempted from review under SEQRA as a Type II action . . . Further, the conveyance is an action ‘of the Legislature and the Governor of the State of New York’. Given the exemption of the casino project from environmental review under SEQRA, respondents properly considered the impacts of the acquisition of the subject property and the relocation of the convention center activities apart from the impacts of the casino project. In any event, even assuming the applicability of SEQRA to both projects, we conclude that the two projects are sufficiently independent of one another as to be separately reviewable. The ‘actions’ or ‘projects’ in question are distinct and are not merely separate parts ‘of a set of activities or steps’ in a single action or project. ‘Where, as here, projects are independent of each other and are not part of an integrated or cumulative development plan,’ and ‘their only common element is their general location,’ ‘the projects may be reviewed separately and are not subject to a claim of improper segmentation,’ nor is ‘cumulative analysis’ of the two projects *274 required.” (305 AD2d at 1026-1027 [citations omitted]).
Applying Settco to the facts at hand, it is uncontroverted that the nine acres owned by the Nation in the City of Buffalo is now exempt from environmental review under SEQRA. Respondents’ actions in connection with the sale of Fulton Street ROW included a detailed environmental review of the impact of said sale to the Nation. Under Settco, segmented environmental review is allowed where the underlying project is deemed exempt as a Type II action (or otherwise in light of the ownership of the nine acres of land by a sovereign nation).
These actions are wholly consistent with the purposes of SE-QRA: to require agencies to incorporate environmental considerations directly into their decision making and, where necessary, to modify action to mitigate adverse environmental effects. (See, Matter of Coca-Cola Bottling Co. of N.Y. v Board of Estimate of City of N.Y., 72 NY2d at 679; Matter of Billerbeck v Brady, 224 AD2d at 938.) The City of Buffalo utilized the negotiation process with the Nation to mitigate adverse environmental impacts associated with the Nation’s actions. The City not only incorporated environmental considerations directly into its decision making, but also mitigated adverse environmental impacts associated with the actions of a sovereign nation not subject to SEQRA. (LUK000456 et seq.)
The Common Council’s Environmental Review
The Common Council’s environmental review process commenced in July 2006 when the Seneca Erie Gaming Commission (SEGC) provided the City with a full environmental assessment form (EAF), supplemental information about the casino, a cultural resources report, a utility impacts report, and a site conditions report. (LUK000500 et seq.) The first step in the environmental review process is for the lead agency to classify a proposed project as a Type I action, a Type II action or an unlisted action. (6 NYCRR 617.6 [a].) A Type I action is one which is more likely to require the preparation of an EIS. (6 NYCRR 617.4 [a].) Type II actions are those that have been determined not to have a significant adverse environmental impact, or are otherwise precluded from an environmental review. (6 NYCRR 617.5 [a].) If a particular activity is neither Type I nor Type II, the activity is classified as an unlisted action. (6 NYCRR 617.2 [ak].)
In late July 2006, the Common Council classified the abandonment and sale of Fulton Street ROW as an unlisted action for *275 purposes of SEQRA, declared, its intent to act as lead agency, and circulated a copy of the EAF and other relevant information to all interested and involved agencies including the City of Buffalo Planning Board, the County of Erie Department of Environmental Planning, the City of Buffalo Appraisal Review Board, the Buffalo Sewer Authority (BSA), the New York State Thruway Authority, the Buffalo Fiscal Stability Authority, the New York State Department of Transportation — Region 5, and the City of Buffalo Department of Public Works, Parks and Streets (DPW). (LUK000319-31.) The Common Council gave each agency 30 days to contest lead agency status. (Id.) No other agency contested the Common Council’s designation. (LUK000444, LUK000449.) Therefore, the Common Council became the lead agency pursuant to SEQRA.
Over the course of the next two months, there were ongoing negotiations between City representatives and the Nation. (See, Lukasiewicz affidavit.) The City’s negotiation team, led by Mayor Brown, utilized the negotiations to secure commitments from the Nation that neither the compact nor federal Indian gaming law require relative to the casino. (Id.) As a result of these negotiations, the City was able to develop an agreement with the Nation which addresses all of the City actions. (Id.) In exchange for the City actions, the Nation agreed to certain limitations and/or mitigation relative to their operation of the casino. (LUK000456.)
The agreement provides, among other things, that the Nation will assist the City with its SEQRA compliance. (LUK000465.) Accordingly, on October 12, 2006, SEGC provided the City with updated and revised environmental documentation analyzing the potential adverse environmental impacts associated with all of the City actions as spelled out in the agreement, including a revised EAF, an expanded environmental analysis and information, a geotechnical evaluation report for the project area, an updated utility impact report, an updated cultural resource analysis, a traffic impact study and an environmental conditions review of the project area. (LUK000500 et seq.)
The traffic impact study evaluates traffic impacts associated with the casino. (LUK000661.) It was used by the City to evaluate whether the proposed roadway and traffic handling improvements required per the agreement would be adequate. (LUK000675-90.) It concludes that with the traffic mitigation measures that the Nation has agreed to implement, at their own cost, there will still be significant delays associated with *276 events at the HSBC Arena, but otherwise the casino will not have negative impacts on existing traffic flows (LUK000690). Interestingly, the traffic impact study indicates that the proposed measures will actually improve upon existing conditions. (Id.)
The Common Council promptly provided the updated and revised environmental documentation to all of the interested and involved agencies including the City of Buffalo Planning Board, the County of Erie Department of Environmental Planning, the City of Buffalo Appraisal Review Board, BSA, the New York State Thruway Authority, the Buffalo Fiscal Stability Authority, the New York State Department of Transportation— Region 5, and DPW (LUK000761-778.)
The Common Council held a special council work session on Wednesday, October 25, 2006, to review and consider the updated and revised environmental documentation. (See, Lukasiewicz affidavit.) The special work session was attended by representatives of DPW, the Planning Staff of the Office of Strategic Planning, Council staff and legal representatives. (See, Lukasiewicz affidavit.) In addition, SEGC’s environmental consultants — those who prepared the updated and revised environmental documentation — including SEGC’s traffic engineers, were also present. (See, Lukasiewicz affidavit.) There was extensive discussion and review of the environmental documentation between the Common Council and the other attendees, particularly about the traffic study and whether the roadway and traffic handling improvements required pursuant to the agreement would sufficiently mitigate adverse traffic impacts associated with the casino. (See, Lukasiewicz affidavit.)
The next day, the Common Council held a public hearing on the proposed abandonment and sale of the Fulton Street ROW to SEGC. (See, Lukasiewicz affidavit.) The hearing was well attended. In particular, the petitioners and their counsel were present and testified extensively as to their opposition to the Nation actions as well as to the City actions. (See, Lukasiewicz affidavit.)
During the SEQRA review, various interested and involved agencies participated in the SEQRA process and assisted the Common Council by providing comments on environmental matters. (See, Lukasiewicz affidavit.) For instance, the New York State Thruway Authority notified the Common Council that the abandonment of the Fulton Street ROW would not have any impact upon the New York State Thruway system. *277 (LUK000444.) The Buffalo Police Department evaluated the potential impacts of the agreement upon police services. (LUK000799.) The Police Department concluded that the agreement would have no detrimental impact upon their ability to police the area of the casino and that existing crowd control procedures will adequately address any large events at the casino. (LUK000799.)
The Buffalo Fire Department also evaluated the potential impacts of the agreement and determined that it would have no negative impact on the Fire Department’s ability to handle fire or other emergencies in the area of the casino. (LUK000800.) In addition, the Fire Department determined that there will be sufficient emergency access to the casino should the Fulton Street ROW be abandoned. (Id.)
The planning staff from the Office of Strategic Planning also participated in the SEQRA process. (LUK000817.) Planning staff, who typically handle SEQRA reviews for the City of Buffalo Planning Board, reviewed all of the environmental documentation submitted by SEGC. (LUK000818.) Planning staff even requested some additional documentation from SEGC, which SEGC supplied. (LUK000818, LUK000939.) Based on their review, planning staff concluded that the environmental information provided a thorough analysis of potential environmental impacts associated with the City actions and supported the issuance of a negative declaration under SEQRA. (LUK000818.)
BSA advised the Common Council that it had reviewed the impacts of providing sewer service to the casino to the BSA system. (LUK000318.) BSA noted that the sewer infrastructure in place in the area of the Buffalo Creek Territory was built at a time when the City had a greater population than it does now. (Id.) In particular, BSA concluded that the area in question, because it was part of a large industrial corridor, would have more than adequate infrastructure to convey the waste generated by a new casino and surrounding development. (Id.) In addition, BSA’s treatment plant can handle any increased flows generated by the casino. (Id.)
DPW also reviewed the environmental documentation and the agreement. (LUK000820.) DPW informed the Common Council that it believed the traffic study adequately addressed the impacts of abandoning and closing the Fulton Street ROW. (Id.) DPW also concluded that the proposed transportation improvements associated with the agreement will adequately *278 address any future traffic issues that may arise as a result of the Nation actions. (Id.) With respect to utility impacts, DPW commented that the proposed relocation plan is appropriate. (Id.) In addition, DPW indicated that it had reviewed the impact of providing water services to the Buffalo Creek Territory and had determined that the City of Buffalo’s water system has capacity that is sufficient to service the proposed development. (Id.)
The day before making its Determination of Significance, the Common Council held a caucus meeting. (See, Lukasiewicz affidavit). As with the public hearing on October 26, 2006, petitioners’ supporters and their counsel were in attendance. (See, Lukasiewicz affidavit.) The Common Council, once again, gave petitioners’ supporters an opportunity to speak to the City actions. Once again, petitioners’ supporters objected to the City actions and urged the Common Council to “fight the Casino” on environmental and other grounds. (See, Lukasiewicz affidavit.) At this meeting, the Common Council also received the final environmental information which SEGC had provided in response to planning staff comments. (LUK000929 et seq.) The Common Council ended the meeting with a discussion of environmental issues. (See, Lukasiewicz affidavit.)
Taking all of the information developed during the environmental review process into account, the Common Council’s Determination of Significance sets forth 20 reasons supporting its negative declaration for the City actions and cites more than 57 documents which the Common Council considered and relied upon (including reports by environmental experts). (LUK000001 et seq.) The relevant areas of environmental concern identified by the Common Council in the Determination of Significance include: potential impacts to land use including unique or unusual land forms; potential impacts to water resources including the water table, protected bodies of water or wetlands; potential impacts associated from construction activities including noise, dust and odors; potential impacts to bedrock; potential impacts to the City’s water system; potential impacts to the City’s sewer system; potential impacts to vegetation and wildlife; potential impacts to agricultural resources; potential impacts to aesthetics; potential impacts to cultural resources; potential impacts to open space and/or conservation areas; potential impacts to recreation, park land and scenic views; potential impacts on critical environmental areas; potential traffic impacts; potential impacts to energy usage; potential *279 impacts to public health and safety; potential impacts to community resources and services; consistency with the City of Buffalo’s comprehensive plan. (See, LUK000007-8.)
The Council Review at Each of the Relevant Areas of Environmental Concern
In the Determination of Significance, the Common Council analyzed, in detail, all of the relevant areas of environmental concern noted above and concluded that the City actions would not result in any significant adverse environmental impacts. (LUK000007-8.)
With respect to the impacts to the City’s water and sewer systems, the Common Council found:
“The Proposed Agreement entails the capping and removal of old cast iron (100± years) water lines in Fulton between Michigan and Marvin and Marvin between South Park and Perry. A new ductile iron water main will be installed in Marvin Street between South Park and Perry. The cutting, capping and removing of these lines will have no adverse impact on the City of Buffalo water system; the system will be able to supply adequate water flows (domestic and fire flows) and pressures to service this Buffalo Creek Territory and surrounding area.
“The sanitary sewer flows for this area will be separated from the storm sewer flows. Storm sewer flows from the Seneca Buffalo Creek Territory will be collected on site and flow to a new dedicated storm sewer line. Sanitary sewer flows from the Seneca Buffalo Creek Territory will discharge into the existing combined sewer along South Park Avenue. Adequate capacity exists within the BSA system for the discharges associated with the casino.” (LUK000007.)
With respect to noise, dust and odors, the Common Council found:
“Construction and excavation activities pursuant to the Proposed Agreement may create minor temporary fugitive dust emissions and may result in minor emissions from construction equipment. These impacts will be temporary and are not significant. There will be temporary noise impacts during construction. However, construction will take place during daylight hours and will not be significant.” (LUK000007-8.)
*280 With respect to traffic impacts associated with the City actions, the Council found:
“The abandonment of the Fulton St. ROW and the road improvements will change traffic patterns in the area. However, the loss of the Fulton St. ROW is not significant (the area has a well developed roadway network system) and, as a result of the Proposed Agreement, the Senecas will undertake at their own expense significant traffic related improvements in the project area. These improvements will result in a significant improvement to traffic conditions in the project area.” (LUK000008.)
With respect to potential impacts to cultural resources, the Common Council found:
“A cultural resource analysis has been completed. The project area is not substantially contiguous to, nor does it contain, buildings, sites or districts listed on the State or National Registers of Historic Places. Further, the construction work associated with the Proposed Agreement should not negatively impact any architectural or cultural resources since the proposed work is limited to the roadbed and does not involve extensive construction within Cobblestone Historic District. In addition, a monitoring and response plan has been developed in the event any archeological artifacts are discovered during construction.” (LUK000008.)
With respect to the consistency of the City actions with the City’s comprehensive plans, the Common Council found:
“The adoption and implementation of the Proposed Agreement, is consistent with the City’s recently adopted Comprehensive Plan entitled ‘Buffalo’s Comprehensive Plan: Queen City in the 21st Century’ dated October 2004. In addition, adoption and implementation of the Proposed Agreement addresses the concerns expressed about the Casino in the ‘Queen City Hub Plan.’ ” (LUK000008.)
In conclusion, the Council determined: “Considering all of the above, the Project will not have a significant adverse impact upon the environment and a negative declaration pursuant to SEQR is hereby issued.” (LUK000008.)
The analysis found in the Determination of Significance, for each of the relevant areas of environmental concern identified by the Council, addresses the requisite “hard look” required by *281 SEQRA. (Chinese Staff & Workers Assn. v City of New York, 68 NY2d 359 [1986].)
The Reasoned Elaboration of the Common Council of the Basis for its Determination
In reaching its determination that a negative declaration was appropriate pursuant to the requirements of SEQRA, the Council made a total of 38 different findings which provide a reasoned elaboration of the basis for its SEQRA determination. As explained in the recitations to the Determination of Significance:
“The Council considered whether the Nation Actions can properly be segmented from the environmental review for the City Actions in accordance with the requirements of SEQR; and “A thorough analysis of the relevant facts and law shows that segmenting the environmental review for the City Actions from the Nation Actions is appropriate and in accord with the requirements of SEQR; and
“The Common Council has carefully considered the full scope of the City Actions having reviewed and considered the entire record and proceedings relating to the City Actions and having considered the comments and points of view of both proponents and opponents of the Casino; and
“The record demonstrates that to the extent there are adverse environmental impacts associated with the City Actions, where necessary, all adverse impacts have been mitigated to the greatest extent possible and that none of these impacts will be significant.” (LUK000008.)
Petitioners argue that even if an environmental review is limited to the City actions, a negative declaration is inappropriate. (See, Knoer affidavit 1111 77-89.) However, an examination of petitioners’ claims show that principally their objections are associated with the potential environmental impacts of the Nation actions and not the City actions. For instance, petitioners argue that the City actions cannot receive a negative declaration because the activities “grossly exceed Type I thresholds.” (Knoer affidavit 11 49.) However, all of the Type I thresholds that petitioners cite relate to the Nation actions rather than the City actions. (See, id.) Petitioners also cite increases in traffic, air pollution, light pollution, and noise to argue that a negative declaration is inappropriate. (Knoer affidavit 11 51.) On the rec *282 ord before the court, these complaints relate to the Nation actions rather than the City actions. (See, for example, Knoer affidavit ¶ 53 [“This excessive lighting will be on 7 days a week, 24 hours a day, 365 days a year”].)
The record shows that the Common Council performed an environmental review of the City actions. As demonstrated above, the Common Council identified relevant areas of environmental concern, took a “hard look” at them and provided a reasonable elaboration of its findings. (LUK0000110.) In reviewing a lead agency’s compliance with SEQRA, the court may not weigh the desirability of the action or determine what, if any, adverse environmental effects may result from it. (Matter of Har Enters, v Town of Brookhaven, 74 NY2d 524, 528-529 [1989].) If an agency has given due consideration to the relevant potential environmental impacts of a project, has reached its determination in a reasonable fashion, and has made a reasoned elaboration of the basis for its decision, a court is not permitted to second-guess the agency’s choice. (Matter of Hollenbeck v Onondaga County Resource Recovery Agency, 225 AD2d 1036, 1036 [4th Dept 1996].)
The Common Council is Vested with Discretion in Determining when a Project is Consistent with a Comprehensive Plan
Decisions of the legislature are vested with a strong presumption of validity. (Kravetz v Plenge, 84 AD2d 422, 428 [4th Dept 1982].) Zoning or land use decisions are required to be consistent with the fundamental land use policies and development plans of the community. (Udell v Haas, 21 NY2d 463, 472 [1968].) However, while stability and regularity are essential to the operation of zoning plans, zoning is not static. (Kravetz v Plenge, 84 AD2d at 430.) The legislature’s obligation is to support “comprehensive planning,” not slavish servitude to any particular comprehensive plan. (Id.; see also, Tilles Inv. Co. v Town of Huntington, 74 NY2d 885, 887 [1989].) “[S]ound planning inherently calls for recognition of the dynamics of change.” (Matter of Town of Bedford v Village of Mount Kisco, 33 NY2d 178, 188 [1973].)
In their motion for injunctive relief, petitioners allege that the sale of Fulton Street ROW is improper because it is inconsistent with the City’s comprehensive plan pursuant to General City Law § 28-a. Petitioners fail to provide any evidence to support their assertions that the abandonment and sale of Fulton Street ROW is inconsistent with the comprehensive plan. Instead, the petitioners argue, as self-evident, that because the *283 abandonment and sale of Fulton Street ROW is related to the Nation’s casino, it is necessarily inconsistent with the comprehensive plan.
The Proposed Agreement is Consistent with the Comprehensive Plan
Petitioners allege noncompliance with the comprehensive plan as well as with the City of Buffalo Queen City Hub Plan. (Petitioners’ mem at 27-28.) Petitioners allege that the Common Council failed to consider the performance criteria for casino gambling suggested in the Queen City Hub Plan. With respect to casino gambling, the Queen City Hub Plan provided as follows:
“The Seneca Nation of Indians has an agreement that allows them to develop casino gambling facilities in Downtown Buffalo. Opinion is divided on whether such a development would be good for Downtown specifically or Buffalo as a whole. In any event, plan reviewers believe a range of key issues need to be addressed and potential social and economic impacts carefully assessed before moving forward. We especially need to know whether a casino would provide net employment and revenue growth for the city, as well as what negative social impacts are likely to occur and how to minimize them.
“Some reviewers of The Queen City Hub say that if a casino is developed it should respond to the following performance criteria:
“1. Locate in Downtown Buffalo in order to take advantage of existing infrastructure, to reuse the stock of existing buildings, and create synergies with other visitor attractions.
“2. Integrate with the City — physically through the careful design of entries and connections, programmatically through business arrangements — to make sure the economic benefits are widely shared locally.
“3. Target tourists, not residents, to make sure the casino attracts outside revenues, avoids exploiting local players, and complements efforts to build convention and tourism business.
“4. Ensure revenue accrues to local government rather than the State — to pay for new infrastructure and services, to invest in Downtown redevelopment, to support tourism development and marketing, and *284 to help provide for the general needs of the city and county.” (City of Buffalo, Queen City Hub — A Regional Action Plan for Downtown, Achieving the Vision: Other Major Proposals, <http://www.citybuffalo.com/Files/l_2_l/Hub/Volume%20I/ 2otherProposals.htm> cached at <http://www. nycourts.gov/reporter/webdocs/DowntownCityof Buffalo.htm> [accessed Apr. 26, 2007].)
Contrary to petitioners’ assertions, the performance criteria identified in the Queen City Hub Plan constitute the issues considered when formulating the agreement with the Nation.
The Buffalo Creek Territory is located between Perry Street to the north and South Park to the south, Michigan Avenue to the west and Marvin Street to the east. With respect to infrastructure, the Nation has committed to a total of $5 million to $7 million in infrastructure improvements to the area surrounding the Buffalo Creek Territory. (LUK000456.) These include significant water, sewer and transportation improvements. (LUK000467.)
The agreement also contemplates the integration of the Nation casino into the surrounding neighborhood. (Id.) The Buffalo Creek Territory is within the Erie Canal Harbor Strategic Investment Area which is slated for further cultural, maritime, residential, commercial, retail, sports and entertainment venues. (See, City of Buffalo, Queen City Hub — A Regional Action Plan for Downtown, Achieving the Vision: Strategic Investment Areas, <http://www.city-buffalo.com/Files/l_2_l/Hub/VoIume%20I/ 2investAreas.htm> cached at <http://www.nycourts.gov/reporter/ webdocs/proposalsbuffalo,htm> [accessed Apr. 26, 2007].) The proposed design for the Nation casino contemplates a park-like atmosphere in an area formally occupied by abandoned industrial uses. (LUK000529.) Further, the proposed orientation of the Nation casino is designed to feed off the HSBC and Dunn Tire Park sports and entertainment venues to the west. (Id.) Since many of the design features resulted from the abandonment of Fulton Street ROW, the agreement helps ensure that the Nation casino is well incorporated into the surrounding neighborhood. (Id.)
Relative to the third and fourth performance criteria, economic concerns were key issues addressed in the agreement. First, the Nation and the City have agreed to work together to facilitate the designation of the City as the “host municipality” pursuant to the compact and section 99-h of the State Finance Law. (LUK000463.) In addition, the Nation has agreed to help assist the City in obtaining at least 25% of the state contribu *285 tion received from gaming operations. (LUK000466.) These monies are slated to be reinvested into development projects for the Inner Harbor area in order to create a critical mass of tourism and visitors in the area. (LUK000466.)
Under the agreement, the Nation has agreed to coordinate with the Buffalo Convention and Visitor Bureau to market the City and the facilities located on the Buffalo Creek Territory as a tourist destination, and specifically market the Nation casino to people outside of the eight counties of Western New York. (LUK000467.) The Nation has also committed up to $1.7 million toward marketing efforts. (LUK001535, LUK000467.)
The proposed agreement also includes work force assurances. (LUK000467.) The Nation has agreed to give preference to Buffalo residents for jobs created by the Nation casino. (Id.) This provision was designed to favor the hiring of City residents, including additional opportunities for minorities and women from economically disadvantaged areas of the City. (LUK000467.)
On the record before the court, consideration and analysis of these issues were addressed by the Common Council prior to the approval of the agreement. The agreement and the environmental analysis performed by the Common Council in connection therewith fully addressed the “performance criteria” included in the Queen City Hub Plan. (LUK000456 et seq.) After evaluating all of these factors and the documents provided by SEGC, the Common Council determined that the adoption and implementation of the agreement is consistent with the City’s comprehensive plan entitled “Buffalo’s Comprehensive Plan: Queen City in the 21st Century” dated October 2004. (LUK00008.) In addition, the Common Council determined that the adoption and implementation of the agreement addresses the concerns expressed about the Nation casino in the Queen City Hub Plan. (Id.) There is sufficient evidence in the record to support this determination. Accordingly, the Common Council’s determination in this regard should not be disturbed. (Matter of Town of Bedford v Village of Mount Kisco, 33 NY2d 178, 186 [1973].)
Common Council Reliance on the KLW Appraisal
The petitioners argue that the Common Counsel is making a gift of Fulton Street ROW to the Nation in violation of the New York State Constitution. The court rejects this argument.
The Charter of the City of Buffalo establishes the process for the sale of abandoned property. Section 27-4 of the City Charter *286 states that after an appraisal, the Common Council, by a two-thirds vote of all members, may authorize the sale of real property acquired by the City for public use, the use of which has been abandoned. Any person wishing to purchase abandoned property may, at his or her own expense, retain an appraiser from a list of appraisers established and approved by the City’s Appraisal Review Board. (Buffalo City Charter § 27-5.) The appraisal must be reviewed and approved by the Appraisal Review Board as an accurate reflection of the value of the abandoned property prior to approval of any sale by the Council. (Id.)
In this case, the Nation retained an appraiser, Klauk, Lloyd & Wilhelm (KLW), from the list of appraisers maintained by the City’s Appraisal Review Board. (See, Lukasiewicz affidavit.) KLW prepared an appraisal (KLW appraisal) which calculated a value of $631,600 for Fulton Street ROW (See, Lukasiewicz affidavit.) The KLW appraisal was reviewed by the Appraisal Review Board which found $631,600 to be an accurate reflection of the value of Fulton Street ROW. (See, Lukasiewicz affidavit.) Petitioners commissioned their own “independent appraisal” which calculated a value of $1,775 million for Fulton Street ROW (Petitioners’ appraisal at 58-60 [attached to petitioners’ order to show cause].)
Petitioners’ basic claim is that the KLW appraisal excessively undervalues the property. (Petitioners’ mem at 28-30.) Petitioners’ appraisal acknowledges that the fair market value of Fulton Street ROW is approximately $632,000, almost identical to the KLW appraisal. (Petitioners’ appraisal at 51.) However, the petitioners’ appraisal then attempts to project an assembled value for Fulton Street ROW of $1,775 million based on the presumptive value of the combination of Fulton Street ROW with the Senecas’ existing 8.85 acres of land. (Petitioners’ appraisal at 58-60.) This presumption includes a projection that the Senecas’ property has increased in value from the $3.75 million the Senecas paid a little over a year ago (petitioners’ appraisal at C-2) to $6,625 million today. (Petitioners’ appraisal at 56.) The petitioners’ appraisal also ignores the added value of the utility relocation costs associated with the transfer of Fulton Street ROW. (Petitioners’ appraisal at 60.)
The petitioners submitted their appraisal to the Common Council at the public hearing for the Fulton Street ROW abandonment. (See, Lukasiewicz affidavit.) Petitioners repeatedly urged the Common Council to accept their appraisal as the fair market value of Fulton Street ROW. (Id.) The Common *287 Council considered and rejected petitioners’ appraisal for the value of the property. The Common Council voted to accept the KLW appraisal and the recommendation of the Appraisal Review Board, and agreed to sell Fulton Street ROW for $631,600 in conjunction with the approval of the agreement. (LUK001533.)
The Common Council’s actions were within the province of its discretionary powers under the City Charter and may not serve as the basis for an injunction. The City is required only to obtain substantial or valuable consideration in order for the transaction to constitute a bona fide sale and not a gift in violation of New York Constitution, article VIII, § 1. (See, Grand Realty Co. v City of White Plains, 125 AD2d 639, 640 [2d Dept 1986]; see also, Landmark West! v City of New York, 9 Misc 3d 563 [2005]; NY Const, art VIII, § 1.) Under New York jurisprudence, it is impermissible for “the court to usurp the decision-making power vested in the Mayor and in the City.” (Creole Enters, v Giuliani, 167 Misc 2d 810, 820 [Sup Ct, NY County 1995].) Unless the City’s actions are illegal, fraudulent, or irrational, “the manner by which ... [a governing body] addresses complex societal and governmental issues is a subject left to the discretion of the legislative and executive branches of our tripartite system.” (Id. at 821-822.)
“Public officials are responsible to the people for the faithful performance of their duties as well as the propriety and wisdom of the policy which they adopt. In the absence of illegality fraud, collusion, corruption or bad faith, the court has no power to restrain the city from entering into or carrying out any agreement which it chooses to make.” (Hanrahan v Corrou, 170 Misc 922, 925 [Sup Ct, Oneida County 1938].)
Here, the Common Council employed the process mandated by the City Charter for the sale of abandoned property. (See, Lukasiewicz affidavit.) The process was fair and sound and the Council reasonably accepted $631,600 as the appropriate value for Fulton Street ROW (LUK001533-37.)
The Hanrahan case is instructive on this point. In that action, the plaintiff sued as a taxpayer and sought to restrain the City of Utica from purchasing property for a sale price the taxpayer thought too high. (170 Misc at 924.) Notwithstanding that there was a significant discrepancy between the appraised value and the purchase price the City agreed to pay, the court held that city officials “are entitled to the presumption that *288 their decision to purchase this property was based upon adequate information and that they were influenced by proper motives.” (Id. at 929.)
The Common Council is entitled to the same presumption. The Common Council studied the agreement and completed a review of the applicable documentation, including petitioners’ independent appraisal prior to making their decision. (See, Lukasiewicz affidavit.) “The court has no power or authority ... to make itself the arbiter of a dispute between some dissatisfied taxpayer and the municipal authorities as to the advisability or wisdom of entering into some particular contract.” (Hanrahan, 170 Misc at 925.)
Petitioners are unable to show that there was any impropriety in the Common Council’s actions. The mere fact that petitioners were able to obtain an appraisal with a higher assembled value fails to show that the Common Council acted with illegal, fraudulent, or irrational behavior and the court is without the power to review the City’s decision without a clear demonstration of fraud, corruption or bad faith. (Creole Enters, v Giuliani, 167 Misc 2d at 821.)
Even if this were not the case — even if the City Charter did not establish a process designed to ensure the sale of abandoned property for an appropriate value, and even if there were no reason to question the petitioners’ independent appraisal — the abandonment and sale of Fulton Street ROW must be evaluated as part of the overall consideration being paid to the City by the Nation under the terms of the agreement. As detailed in the agreement, in exchange for the sale and abandonment of Fulton Street RON/^ the provision of water and sewer services and making available certain police and fire services, the Nation is agreeing to various commitments of great value to the City, including a commitment of $5 million to $7 million for infrastructure improvements to City-owned lands around the Buffalo Creek Territory. (LUK00456-467.) When viewed in the context of the entire proposed agreement, it is clear that the City has not made a gift of Fulton Street ROW to the Nation in violation of the New York State Constitution. Petitioners’ claims in this regard are rejected by the court.
The Common Council Approval of the Abandonment and Sale of Fulton Street ROW Pursuant to City Charter § 27-4
The petitioners argue that the Common Council improperly sold Fulton Street ROW under the procedures in the Buffalo City Charter which govern the sale of abandoned property *289 (§ 27-4) instead of the procedures which govern the sale of property for redevelopment (§ 27-13). (See, Knoer affidavit 1Í1Í 22-25.)
The Common Council’s authority to abandon and sell public rights-of-way is enumerated in several provisions of the Buffalo Charter and Code. First, City Charter § 2-1 (7) provides that the City shall have the power to “alter and discontinue and close to public travel, in whole or in part, streets, alleys, highways, and squares, and to regulate and control the acquisition, care, management and use thereof.” (See also, General City Law § 20 [7].) City Charter § 3-7 (j) then confers this authority upon the Common Council.
The process by which city property can be abandoned and sold is governed by section 27-4 of the Buffalo Charter. (See also, General City Law § 23 [2].) More specifically, section 27-4 provides the following process: “After an appraisal . . . , the council may by a two-thirds vote of all the members elected thereto authorize the sale of real property acquired by the city for public use, which has not been appropriated thereto, or the use of which for such purpose has been abandoned.” While section 23 (2) of the General City Law requires a three-fourths majority of the legislative body for the sale of public property, a city may adopt legislation which alters those voting requirements.
The Attorney General has specifically opined on this issue. In Informal Opinion No. 83-16 on this exact issue, the Attorney General opined that pursuant to the Municipal Home Rule Law, the City is free to establish its own voting requirements for the sale of real property and supersede the general requirements of General City Law § 23. (1983 Ops Atty Gen No. 83-16 [1983].)
The reason for the divergence from the requirements of General City Law § 23 (2) was enunciated by the court in Colonial Motor Coach Corp. v City of Oswego (126 Misc 829 [1926], affd 220 App Div 809 [4th Dept 1927]). The court found that section 23 of the General City Law is not an absolute requirement that the sale or abandonment of city property must be authorized by a vote of three fourths of all the members of the Common Council or be disposed of at public auction to the highest bidder. (Id. at 836.) Rather, General City Law § 23 (2) allows the legislature to usurp a local rule (pursuant to a three-fourths vote) which inhibits the ability of the legislature to convey public property. (Id. at 837.)
In Mr. Knoer’s affidavit, he asserts that section 27-13 of the City Charter governs the sale of Fulton Street ROW However, *290 by its clear language, section 27-13 governs the sale of city property for urban renewal or development purposes. This section specifically mimics the provisions of the Urban Renewal Law (General Municipal Law art 15) which provides the process by which property can be sold for urban renewal projects. The City’s sale of Fulton Street ROW is simply not part of any urban renewal project and therefore is not subject to the voting requirements of section 27-13 of the Charter.
On October 31, 2006, the Common Council voted on a resolution to abandon and sell Fulton Street ROW (LUK001533-38.) At the meeting, the Common Council voted by a two-thirds majority to abandon and sell a portion of Fulton Street ROW between Michigan Avenue and Marvin Street pursuant to the terms and conditions of the agreement. (LUK001538.) Therefore the abandonment and sale of Fulton Street ROW was properly approved by the Common Council.
Preliminary Injunction Standard of Review
Under CPLR 6301, parties seeking injunctive relief are required to demonstrate (1) the likelihood of ultimate success on the merits; (2) irreparable injury if the preliminary injunction is not granted; and (3) a balancing of the equities in their favor. (Doe v Axelrod, 73 NY2d 748, 750 [1988]; Time Sq. Books v City of Rochester, 223 AD2d 270, 272 [4th Dept 1996].) A plaintiff bears the burden of proof as to each element of the claim for injunctive relief (Aetna Ins. Co. v Capasso, 75 NY2d 860, 862 [1990].)
A preliminary injunction “should be awarded sparingly, and only where the party seeking it has met its burden of proving both the clear right to the ultimate relief sought, and the urgent necessity of preventing irreparable harm.” (City of Buffalo v Mangan, 49 AD2d 697, 697 [4th Dept 1975]; Anastasi v Majopon Realty Corp., 181 AD2d 706, 707 [2d Dept 1992] [“(p)reliminary injunctive relief is a drastic remedy that will not be granted unless a clear right to it is established under the law and upon undisputed facts found in the moving papers, and the burden of showing an undisputed right rests upon the movant”].)
Likelihood of Success on the Merits
“A preliminary injunction should not be granted where the right to ultimate relief in the action is in doubt.” (Rupert v Rupert, 190 AD2d 1028, 1028 [4th Dept 1993].) Where petitioners cannot demonstrate a likelihood of success on the merits injunctive relief is inappropriate.
*291 In substance, petitioners’ claims are grounded in the necessity of demonstrating that the City of Buffalo, prior to selling Fulton Street ROW to the Nation, is mandated under SEQRA to perform a Type I environmental review of the entire class III gaming casino project. (ECL 8-0101 — 8-0107; 6 NYCRR 617.4.) The uncontroverted record demonstrates that the City has performed a detailed segmented environmental review of the sale of Fulton Street ROW to the Nation. The uncontroverted record further demonstrates the City is without legal authority over the nine acres owned by the Nation even if a Type I environmental review were performed. Again, while discouraged under SEQRA, a segmented environmental review is permitted under New York law in appropriate circumstances. (See, Matter of Concerned Citizens for Envt. v Zagata, 243 AD2d 20, 21, 22 [3d Dept 1998]; Matter of Settco, LLC v New York State Urban Dev. Corp., 305 AD2d 1026 [4th Dept 2003].)
Under the unique facts of this action, in that the Nation owns in fee simple approximately nine acres of land in the city of Buffalo upon which it has the absolute right to build a class III gaming casino, the most respondents can accomplish is segmented review of the project with respect to the proposed sale of Fulton Street ROW and related City actions. Notwithstanding the strong public policy considerations favoring comprehensive environmental review, the City is not required to participate in an exercise in futility concerning the nine acres of land owned by the Nation. On the record before the court, petitioners have failed to demonstrate that respondents are required to perform a Type I environmental review of the Nation’s project. Even if respondents could be compelled to do a Type I environmental review on the entire project, the Nation would be under no obligation to follow its mandate. Since segmented environmental review is permitted under SEQRA on the uncontroverted facts before the court, petitioners cannot demonstrate a likelihood of success on the merits and the grant of a preliminary injunction is inappropriate.
Immediate and Irreparable Harm
In order to obtain a preliminary injunction, petitioners must also demonstrate that they will sustain irreparable injury if the preliminary injunction is not granted. (Time Sq. Books v City of Rochester, 223 AD2d 270, 272 [4th Dept 1996].) An injunction should only issue where the peril to the petitioners is very *292 substantial and imminent. (Board of Educ. of Union Free School Dist. No. 3 v National Educ. Assn. of U.S., 63 Misc 2d 338, 341 [Sup Ct, Suffolk County 1970].)
The drastic remedy of a temporary injunction should only be issued when “urgent necessity” has been shown by the petitioners. (Flack v Shelter Harbor Assn., 35 Misc 2d 321, 322 [Sup Ct, Nassau County 1962].)
On the present record, it is clear the Nation has the unfettered right to build a class III gaming casino in the city of Buffalo. The petitioners’ environmental concerns are principally addressed to the environmental impact which the Nation’s class III gaming casino will have upon them. Respondents’ proposed sale of Fulton Street ROW to the Nation will not result in petitioners suffering immediate and irreparable injury. Instead, petitioners’ claims of immediate and irreparable injury result in both cause and effect from the Nation’s construction of a class III gaming casino on its land. Petitioners have failed to demonstrate that they will suffer immediate and irreparable injury as a result of the sale of Fulton Street ROW by the City to the Nation.
The Equities Do Not Favor the Petitioners
The third and final requirement for injunctive relief is a showing that the equities balance in favor of petitioners. (Time Sq. Books v City of Rochester, 223 AD2d 270, 272 [4th Dept 1996]; CPLR 6301.) A party seeking a preliminary injunction must establish that it will sustain irreparable injury that would be more burdensome to the petitioner than the harm the other party would sustain through the imposition of the injunction. (CPLR 6301.) When balancing the equities and upon weighing the hardships that might be imposed, where the balance appears to favor the defendants, the preliminary injunction must be denied. (Western N.Y. Motor Lines v Rochester-Genesee Regional Transp. Auth., 72 Misc 2d 712, 717 [Sup Ct, Monroe County 1973].)
A balancing of the equities does not favor the petitioners. The Seneca Nation of Indians is a sovereign Indian Nation. The location of the casino is on sovereign land known as the Buffalo Creek Territory. Pursuant to the Indian Gaming Regulatory Act of 1988, the compact, and the authorizing statute enacted by the United States Congress, the Nation has the lawful right to construct a class III gaming casino on the Buffalo Creek Territory. The City of Buffalo simply does not have the ability or the authority to prevent the Nation’s construction of a class III *293 gaming casino. As recited on the record, the Nation initiated construction activities in December 2005 that continue at this time.
Respondent, City of Buffalo, developed the agreement with the Nation which embodies certain assurances for the citizens of Buffalo and Western New York relative to its operation of the casino on the Buffalo Creek Territory. (See, Lukasiewicz affidavit.) The negotiation process was challenging and negotiations broke off several times. (See, Lukasiewicz affidavit.) Finally, the City and the Nation were able to negotiate an agreement that both sides determined to be in the best interests of their organizations and their constituencies. (See, Lukasiewicz affidavit.)
Under the terms of the agreement, in exchange for Fulton Street ROW and other consideration, the Nation will: (1) spend between $5 million and $7 million making infrastructure improvements to City-owned lands around the Buffalo Creek Territory; (2) integrate the Nation casino structures with the surrounding community and build an urban park; (3) employ approximately 1,000 people at the Nation casino, give preference to City of Buffalo residents for 50% of these jobs and recruit in high unemployment areas; (4) abide by a policy of trying to have a work force composed of at least 25% minorities and at least 8% women; (5) engage in marketing the casino beyond Western New York; and (6) not acquire additional property for casino operations. (See Lukasiewicz affidavit.)
Without the agreement, the City will be forced to accept whatever casino the Nation chooses to build on the Buffalo Creek Territory without any agreement or any assurances for the citizens of Buffalo and Western New York about how that casino will be operated. If injunctive relief is granted based on petitioners’ application, the Nation may not approve the agreement, in which case the City (and its citizens) will lose all of the benefits of the agreement and receive nothing in return.
In stark contrast, the petitioners will not benefit from the issuance of a preliminary injunction. The Nation may proceed with construction of a class III casino, in the city of Buffalo, regardless of the sale or nonsale of Fulton Street ROW Accordingly, the equities weigh in favor of respondents and the preliminary injunction must be denied.
Petitioners have failed to demonstrate likelihood of success on the merits, irreparable injury or that the balance of equities *294 favor them. Accordingly, petitioners’ motion for a preliminary injunction is denied in its entirety.
Respondents’ Motion for Sanctions Petitioners’ request for injunctive relief was brought in good faith and is supported by relevant principles of law. Although the court has denied petitioners’ motion for a preliminary injunction, respondents have failed to demonstrate that petitioners’ motion is frivolous. Respondents’ motion for sanctions is denied.